**Leroy CRANE, et al., Plaintiffs,**

**v.**

**COMMISSIONER OF DEPARTMENT OF AGRICULTURE, FOOD AND RURAL RESOURCES, et al., Defendants.**

**Civ. No. 85–0010–B.**

United States District Court, D. Maine.

Feb. 7, 1985.

---

Linda Smith Dyer, and Clifford Goodall, Dyer, Goodall & Zeegers, Augusta, Me., for plaintiffs.

Jeffrey M. Frankel, and Cabanne Howard, Asst. Attys. Gen., Augusta, Me., for defendants.

Richard A. Spencer, Kathleen Barry, Drummond, Woodsum, Plimpton & Mac-Mahon, Portland, Me., for intervenors.

## MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION

CYR, Chief Judge.

██ Five Maine milk producers brought this action against the Commissioner of the Maine Department of Agriculture, Food and Rural Resources and against the Maine Milk Commission,[1] challenging the constitutionality of the Maine Milk Pool Act [Act], the core provisions of which appear in 7 M.R.S.A. §§ 3153 and 3154. Plaintiffs preliminarily sought to enjoin defendants from disbursing monies pooled under the Act; ultimately, they demand permanent injunctive relief and a judicial declaration that the Act violates the supremacy, commerce, and equal protection clauses of the Federal Constitution.[2] Defendants assert that the Act is constitutional, that injunctive relief is inappropriate and that the action is barred by the principles of *res judicata*.[3]

Upon consideration of all of the pleadings, affidavits and memoranda, and after hearing and consideration of all representations and arguments of counsel, the court is satisfied that plaintiffs are not entitled to preliminary injunctive relief.

### The Act and the Classified Pricing System for Milk

Prices paid to Maine dairy producers are established under two separate regulatory

1. Argi-Mark, Inc., a Massachusetts-based dairy farmer cooperative, and two of its individual members were granted leave to intervene as parties defendant.

2. For purposes of preliminary injunctive relief, plaintiffs do not rely on their commerce clause and equal protection challenges.

3. Contending that amounts deducted for promotional purposes from monies pooled under the Act are taxes, defendants assert that this court lacks subject matter jurisdiction to enjoin collection or disbursement of such monies by virtue of 28 U.S.C. § 1341. The Anti-Injunction Act provides that—

 [t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state.

In *Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources*, 483 A.2d 1213 (1984), the Maine Supreme Judicial Court [Law Court] concluded that payments made into the Milk Pool by Maine market dealers for redistribution to producers are neither taxes nor assessments but "are simply the mechanism adopted by the legislature for effectuating equalization of the price received by all Maine dairy farmers for their milk." 483 A.2d at 1219. The Law Court did hold that amounts deducted for promotional purposes are properly characterized as taxes. *Id.* at 1218.

Because the meaning of the term "tax under state law" as used in § 1341 is a matter of federal law, *see Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 374 (3d Cir. 1978), the Law Court's characterization is not dispositive. In view of this court's conclusion that preliminary injunctive relief is not warranted, the Anti-Injunction Act issue need not be decided at this juncture.

schemes: (1) the Maine Milk Commission Law, 7 M.R.S.A. §§ 2951–61 (1979 & Supp. 1983–84), and (2) Federal Milk Order No. 1 [Order], 7 C.F.R. § 1001 (1984), promulgated pursuant to the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. §§ 601–24 (1980 & Supp.1984). Under both regulatory schemes dairy producers are paid for their milk according to a "classified pricing system," which requires dealers to pay for milk according to the nature of the actual use to which the milk is put. 7 M.R.S.A. § 2954(2)(A); 7 C.F.R. § 1001.40 *et seq.* Thus, if the dealer sells his milk in fluid form for drinking purposes the dealer is required to pay a higher "Class I" price, but if the milk is sold by the dealer for other purposes, such as for cheese or ice cream, the dealer pays a lower "Class II" price. 7 M.R.S.A. § 2954(2)(A); 7 C.F.R. § 1001.50. The dairy producer in turn receives a "blend price" calculated on the basis of the weighted average of Class I and Class II sales. 7 M.R.S.A. § 2956(3); 7 C.F.R. §§ 1001.60, 1001.73.

Under the Maine statutory scheme, 7 M.R.S.A. §§ 2951–61, the blend price paid to *Maine market* producers, *see* 7 M.R.S.A. § 3152(1), is calculated by computing the percentages of Class I and Class II milk sold by *each dealer*, so that the blend price paid to Maine market producers varies from dealer to dealer. 7 M.R.S.A. § 2956(3). Maine producers selling to different Maine market dealers generally receive different blend prices per hundred weight for their milk. *See generally Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources*, 438 A.2d 1213, 1216 (Me.1984).

Maine's *Boston market* producers, that is, Maine milk producers who sell their milk to dealers subject to the regulatory authority of the Federal Order, *see* 7 M.R.S.A. § 3152(3), are paid a blend price for their milk calculated on the basis of the weighted average of all Class I and Class II milk sold in the *entire Boston market.* 7 C.F.R. § 1001.73. The result is that under the Federal Order all dealers pay their producers the same marketwide blend price, irrespective of the actual use to which any particular Boston market dealer's milk is put. The uniform payments to Boston market producers are accomplished by means of a "producer settlement fund," which requires dealers with above average Class I sales to pay their producers the marketwide blend price and to pay any Class I premium into the producer settlement fund. The settlement fund is later disbursed to dealers with below average Class I sales to enable them to pay their producers the average blend price. 7 C.F.R. §§ 1001.70–1001.72.

These dual marketing and pricing schemes have produced certain discrepancies between the prices received by Maine market producers and those received by Maine's Boston market producers. As the Maine Supreme Judicial Court observed:

Historically, Maine market dealers have had higher Class I utilization rates than their Boston market counterparts. As a result, producers selling on the Maine market get a higher price for their milk than producers selling on the Boston market. This extra amount is sometimes referred to as the 'Maine market premium.' The Maine market dealers' higher utilization rates come from their practice of buying 'short'; they purchase locally only enough milk to satisfy their average needs and buy any additional amounts needed or sell any local surplus on the Boston market. That practice benefits both Maine market producers, who receive higher blend prices as a result, and Maine dealers, who avoid handling large amounts of excess local production for which they have little use and on which they sometimes bear a cost. The Maine market premium has been going to fewer and fewer producers in the recent past. As Maine market producers increase production and add to the Maine dealers' milk supply, the dealers drop some producers onto the Boston market.

*Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources*, 483 A.2d at 1216–17. To correct these inequities the Maine Legislature

enacted the Act, the purpose of which, *inter alia,* is to serve "a redistributive function to the end of achieving substantial price equality for all Maine produced milk," *id.* at 1217.

Under the Milk Pool Act, each Maine market dealer must compute its blend price twice, 7 M.R.S.A. § 3153(2)(A): the first computation is based on its individual utilization rate, while the second is based on the combined utilization rates of all the Boston market dealers. The producers selling to these Maine market dealers are immediately paid the Boston market blend price. The dealers then pay the difference between their individual blend prices and the Boston market blend price into the Maine Milk Pool. At this point in the process, the Maine market producers and the Boston market producers have received the same price for their milk, namely, the Boston market blend price, while the Maine market premium has been paid into the pool. Then, the pool is equally allocated among Maine market and Boston market producers on a per hundredweight basis. *Id.*

## PRELIMINARY INJUNCTIVE RELIEF

In order to obtain preliminary injunctive relief the plaintiffs must show: (1) that they will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) that plaintiffs are likely to succeed on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979).

### Likelihood of Success

### I. *Res Judicata*

On May 17, 1984, two weeks before the Act was to take effect,[4] Maine Milk Produc-

ers, Inc. [MMP], a membership corporation comprised of Maine market producers, and certain of its member producers filed a civil action in the Kennebec County Superior Court against the Commissioner of the Maine Department of Agriculture, Food and Rural Resources [Commissioner] and the Maine Milk Commission [Milk Commission], seeking preliminary and permanent injunctive relief enjoining implementation of the Act, as well as a judicial declaration that the Act violated certain provisions of the Maine Constitution and the supremacy, commerce, equal protection and due process clauses of the Federal Constitution. Because there was no dispute as to the material facts underlying the litigation the presiding justice consolidated the requests for preliminary and permanent injunctive relief.

On June 29, 1984 the superior court entered its judicial declaration that the Act violated Article I, § 6–A (equal protection clause) and Article IX, § 8 (tax clause) of the Maine Constitution, and enjoined the Commissioner from implementing the Act.[5] The state court defendants timely appealed the order of the superior court to the Law Court and on October 31, 1984 the Law Court reversed the judgment of the superior court and vacated the injunction. The Law Court held that the Act is a valid exercise of the legislative power to engage in economic regulation. The Law Court expressly found no merit "in any of the alternative arguments presented by plaintiffs for affirming the Superior Court's declaration of unconstitutionality." *Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources,* 483 A.2d at 1221. Plaintiffs' motion for reconsideration was denied on December 5, 1984. On December 6, 1984 the Law Court issued its mandate. Plaintiffs did not seek review by the United States Supreme Court.

---

4. The Act was enacted in June 1983 and signed into law on July 1, 1983, but was not to take effect until June 1, 1984.

5. The presiding justice expressly recognized but did not decide the federal constitutional issues.

Under general principles of *res judicata* a final judgment on the merits bars further claims by parties or their privies based on the same cause of action and prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.[6] *Ramirez Pluguez v. Cole,* 571 F.2d 70, 71 (1st Cir.1978), *citing Lovely v. Laliberte,* 498 F.2d 1261, 1263 (1st Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). *Res judicata* not only encourages reliance on adjudications and reduces unnecessary and vexatious litigation, but also promotes that comity between state and federal courts which has been recognized "as the bulwark of the federal system." *Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 415–416, 66 L.Ed.2d 308 (1980). *See also Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). In applying *res judicata* "a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education,* — U.S. —, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466–67, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982).

For the Maine doctrine of *res judicata* to apply, "the court must satisfy itself that (1) the same parties, or their privies, are involved; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision were, or might have been litigated in the prior action." *Kradoska v. Kipp,* 397 A.2d 562, 565 (Me.1979). *See also Beegan v. Schmidt,* 451 A.2d 642, 644–45 (Me.1982).

**A. *Identity of Parties***

The principal state court plaintiff, MMP, is a non-stock membership corporation made up of individual Maine market producers subject to the pricing authority of the Milk Commission. The federal court plaintiffs are five individual Maine market producers. The attorney representing the federal court plaintiffs represented all plaintiffs in the state court litigation. It is undisputed that MMP is financing the federal court action and that four of the five federal court plaintiffs are members of MMP who contributed money towards meeting MMP's expenses in litigating the state court action. Because the named plaintiffs in the state and federal court actions are not identical, the issue is whether the federal plaintiffs are in privity with MMP for *res judicata* purposes.

The applicability of *res judicata* generally and preclusion by representation specifically "must be determined as a matter of substance and not of mere form," based in part on an identification of the interests advanced in the first proceeding. *Chicago, Rock Island & Pacific Railway Co. v. Schendel,* 270 U.S. 611, 620, 46 S.Ct. 420, 424, 70 L.Ed. 757 (1926). *See also Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1233 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). *Cf.* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4448 at 408–09 [court must look to reasons for holding a person bound by a prior judgment].

An analysis of the preclusive effect of association representation requires consideration of several factors, including: (1) the adequacy of representation; (2) whether individual members of an association have interests which conflict with those of the association; (3) the degree to which the association is involved in the activities of

---

**6.** As used throughout this opinion, *res judicata* refers to the preclusive effect of the earlier state court judgment as to all matters which were or could have been litigated in the state court action; customarily referred to as "claim preclusion," it encompasses the law of merger and bar. *See I.A.M. National Pension Fund v. Industrial Gear Manufacturing Co.,* 723 F.2d 944, 947 n. 2 (D.C.Cir.1983). *See also* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4402 (1981).

its individual members; (4) whether, and to what extent, individual members participated in earlier litigation involving the association; and (5) whether, and to what extent, individual members have authorized the association to represent their individual interests. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction*, § 4456 (1981).

In the vast majority of cases the determination as to whether individual members of an association or membership organization are bound by a judgment in an earlier action involving the organization usually turns upon whether the members consented to or otherwise authorized the association or organization to represent their individual interests. *See, e.g., Ellentuck v. Klein*, 570 F.2d 414, 425–26 (2d Cir.1978) [individual property owners, who had authorized neighborhood association to represent their interests in litigation, bound by judgment in ensuing action]. *Compare Grossman v. Axelrod*, 466 F.Supp. 770, 774–75 (S.D.N.Y.1979), *aff'd*, 646 F.2d 768 (2d Cir.1981) [nursing home proprietor bound by judgment in state court action litigated by trade association of which he was a member, even though he had never authorized association to pursue the action on his behalf]. *See also Expert Electric, Inc. v. Levine*, 554 F.2d at 1232–33; *Panza v. Armco Steel Corp.*, 316 F.2d 69, 70 (3d Cir.), *cert. denied*, 375 U.S. 897, 84 S.Ct. 174, 11 L.Ed.2d 125 (1963).

■ The authorization by individual members may be express or implied. Thus, in *General Foods Corp. v. Massachusetts Department of Public Health*, 648 F.2d 784, 788 (1st Cir.1981), the First Circuit held that members of a trade association who had financed an earlier action brought by the association on behalf of its members impliedly authorized the association to represent them in the earlier proceeding; the members were deemed in privity with the association for *res judicata* purposes. Central to the court's decision in

*General Foods* were the facts that the challenged regulation did not directly affect the trade association itself but only its members and that the trade association's standing to sue in the earlier proceeding had depended on its claimed right to represent its members as the real parties in interest. *Id.* at 787.

■ As in *General Foods*, implementation of the Act will not directly affect MMP itself, but its individual members. MMP's standing in the earlier state court action was predicated on its right to represent its members. Four of the five plaintiffs in the present action are members of MMP and have contributed money towards MMP's expenses in litigating the state court action.[7] MMP's state court challenge to the Act was not limited to attacking specific provisions of the Act, but was broadly based, seeking nothing less than total nullification of the Act. The harm alleged by MMP in the state court action is identical to the harm alleged by the federal court plaintiffs. The similarity of interests between MMP and these plaintiffs and the identity of purposes behind the state and federal court actions are made manifest by the fact that MMP is financing the present action as well. Moreover, inasmuch as the attorney representing the federal court plaintiffs is the same attorney who represented MMP in the state court action, there is little question that the representation of MMP in the earlier action was adequate. *See General Foods Corp. v. Massachusetts Department of Public Health*, 648 F.2d at 788. Therefore, under the reasoning in *General Foods*, these four MMP-member plaintiffs impliedly authorized MMP to represent their interests in the state court action and are deemed to have been in privity with MMP in its earlier challenge to the Act.

The fifth plaintiff, Thomas Campbell [Campbell], presents a closer question. Plaintiffs commenced this suit on January 7, 1985. Campbell was not one of the

---

7. If, as defendants represented at oral argument, MMP was organized solely for the purpose of challenging the validity of the Act, the members' authorization of MMP to represent the members' interests would be even clearer.

original named plaintiffs. On January 9, 1985 Agri-Mark, Inc. filed its application for leave to intervene as a party defendant and raised the *res judicata* issue. On January 16, 1985, plaintiffs filed their amended complaint, which is identical in all respects to their original federal complaint except that it added Campbell as a plaintiff. At the hearing on plaintiffs' motion for a preliminary injunction Campbell testified that on January 15, 1985 he received a telephone call from the president of MMP, an acquaintance of Campbell's, who asked if Campbell would join the federal court action. During this telephone conversation Campbell was told by plaintiffs' attorney that she needed someone who was not a member of and had not contributed money to MMP.

In these circumstances the court is satisfied that Campbell was enlisted as a plaintiff by the president of MMP to evade and defeat the preclusive effect of the earlier state court judgment against MMP. However, the inquiry does not end there. Campbell testified that he first learned of MMP when it was in the process of being organized. According to Campbell, the president of MMP had invited him to join at that time, but Campbell declined for personal and financial reasons. Campbell testified that he has (1) never been a member of MMP, (2) not contributed any funds to the organization,[8] and (3) not attended any meetings or otherwise been involved in MMP's decisionmaking process.

In the present state of the development of the law in this field it remains unclear whether Campbell is precluded from litigating his federal constitutional claims in the absence of express or implied authorization, *General Foods Corp. v. Massachusetts Department of Public Health*, 648 F.2d at 788, 790, participation in or control over the prior state court proceedings, *Montana v. United States*, 440 U.S. 147, 151, 99 S.Ct. 970, 972, 59 L.Ed.2d 210 (1979); *Gerrard v. Larsen*, 517 F.2d 1127,

1134–35 (8th Cir.1975), or evidence suggesting the kind of relationship between Campbell and MMP from which it could be found that MMP was in some way accountable to Campbell in the earlier state court proceeding, *Hardy v. Johns-Manville Corp.*, 681 F.2d 334, 340 (5th Cir.1982); *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980). What is clear is that mere similarity of interests and a "quantum" of representation of those interests in the earlier action, without more, are insufficient to preclude a nonparty. *See Griffin v. Burns*, 570 F.2d 1065, 1071 (1st Cir.1978). *See also Dills v. City of Marietta*, 674 F.2d 1377, 1379–80 (11th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983). Similarly, the fact that the parties are represented by the same attorney in both actions is not determinative of the privity question. *See Pollard v. Cockrell*, 578 F.2d 1002, 1007 (5th Cir.1978).

The defendants would have the court rely on the "virtual representation" theory of preclusion. Under this approach a nonparty may be bound by a prior judgment if a named party in the prior action was so clearly aligned with the interests of a nonparty (who is a named party in the subsequent action) as to be considered his virtual representative. *See Aerojet General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Grossman v. Axelrod*, 466 F.Supp. at 774–75. More recently, the virtual representation theory has been criticized and limited by the Fifth Circuit, *see Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 95, 97 (5th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977), and, in the First Circuit, at least to the extent that it is predicated solely on a similarity of interests, virtual representation has been all but rejected, *General Foods Corp. v. Massachusetts Department of Public Health*, 648 F.2d at 790. *See Griffin v. Burns*, 570 F.2d at 1072.

---

8. Upon questioning by counsel for the defendants, Campbell stated that he was not contributing funds to MMP "at this time."

However, a respected authority suggests that virtual representation may retain "a narrow role ... so long as adequate litigation remains the central requirement." 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4457 at 502. Accordingly, "[c]lose nonlitigating relationships with a party, participation, apparent acquiescence, and perhaps deliberate maneuvering to avoid the effects of the first action are among the factors to be weighed "in determining whether a nonparty may be bound by the earlier judgment. *Id.*

Campbell was aware of the earlier state court action. He was invited to join MMP by its president. Except for reasons totally unrelated to the litigation position taken by MMP in the state action, with which Campbell was in full sympathy, he would have joined MMP before the state court action began. It is clear that the identical interests were at stake in both actions and that those identical interests were mutually shared by MMP and Campbell. When the Law Court reversed the superior court, Campbell immediately responded by contacting the president of MMP for the purpose of inquiring whether anything more could be done. Moreover, MMP is financing the federal court action, as it did the earlier one. Far from separately pressing his individual rights, Campbell alleges harm identical to the harm previously asserted by MMP in the state court action and by the four MMP-member plaintiffs in the present action. Finally and as more fully discussed below, MMP was provided a full and fair opportunity to litigate all of its claims in the state court action. These considerations, together with MMP's efforts to defeat preclusion through its enlistment of Campbell, may well be sufficient to establish virtual representation. *See General Foods*, at 790 [One relevant inquiry is whether a named party in the earlier action "is using [a nominal party in the later action] as its agent for the purpose of evading the [earlier] ... judgment...."]. (*Dictum*).

## B. *The State Court Judgment*

■ Under Maine law a judgment is final when it is properly docketed and directs a specific disposition of the matters in issue, *Fernald v. Maine State Parole Board*, 447 A.2d 1236, 1237 (Me.1982); *Breau v. Breau*, 418 A.2d 193, 195 (Me. 1980), and where it finally disposes of the action and leaves no further question for consideration by the court, *Martel v. Inhabitants of the Town of Old Orchard Beach*, 404 A.2d 994, 995 (Me.1979), *citing In Re Spring Valley Development*, 300 A.2d 736, 754 (Me.1973).

■ On December 6, 1984 the Law Court entered its mandate vacating the declaration of unconstitutionality and the injunction enjoining the Commissioner from implementing the Act. Nothing was left for consideration by the Law Court. Any contention that the judgment lacks finality was foreclosed by the Law Court's later denial of appellees' motion for reconsideration.

■ Nor is there any question that the Law Court's judgment was "on the merits." The requirement that for purposes of claim or issue preclusion a judgment must be on the merits "guarantees to every plaintiff the right once to be heard on the substance of his claim," *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir.1968). A judgment on the merits thus differs from a judgment that merely disengages the parties through matters of practice, procedure, jurisdiction or form. *Clegg v. United States*, 112 F.2d 886, 887 (10th Cir.1940).

The state court plaintiffs fully presented their state and federal constitutional claims to the state superior court. Although plaintiffs merely mentioned their supremacy clause argument in their brief to the Law Court, without fully briefing or arguing that or their other federal constitutional claims, the Law Court reached and decided both the state and federal constitutional issues in its decision.[9] The Law Court ex-

---

9. In their brief to the Law Court plaintiffs spe-

cifically requested a remand to the superior

pressly found no merit "in any of the alternative arguments presented by the plaintiffs for affirming the Superior Court's declaration of unconstitutionality," 483 A.2d at 1221. The Law Court's terse disposition of the federal constitutional claims does not vitiate the *res judicata* effect of its judgment or render it any less a judgment "on the merits." *Cf. Friarton Estates Corp. v. City of New York*, 681 F.2d 150, 159 (2d Cir.1982) [where state trial court opinion may not satisfactorily have addressed plaintiff's constitutional claims, intermediate appellate court wrote no decision and highest court branded constitutional claims as insubstantial, the constitutional claims were nevertheless held to have been entertained and denied on the merits]; *Brown v. Georgia Power Co.*, 371 F.Supp. 543, 548 (S.D.Ga.1973), *aff'd*, 491 F.2d 117 (5th Cir. 1974) [although record disclosed that state court did not specifically rule on plaintiff's constitutional claim, a holding adverse to the plaintiff was implied by the judgment]; *Mertes v. Mertes*, 350 F.Supp. 472, 474 (D.Del.1972), *aff'd mem.*, 411 U.S. 961, 93 S.Ct. 2141, 36 L.Ed.2d 681 (1973) [where state's highest court refused to consider plaintiff's constitutional claims because of plaintiff's failure to raise them in trial court, constitutional issues treated as though decided adversely to the plaintiff].

### C. *Cause of Action*

Whether "the matters presented for decision were or might have been litigated in the prior action" depends upon whether the same cause of action was before the court first entering judgment. *Kradoska v. Kipp*, 397 A.2d at 568. Under the "transactional" or "pragmatic" test of Maine law, a cause of action is "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial." *Id.*, quoting 1 Field, McKusick & Wroth, *Maine Civil Practice* § 18.1 (1959). *See Roy v. City of Augusta*, 712 F.2d 1517, 1520 (1st Cir.1983) [applying Maine rules of preclusion]; *Harrington v. Inhabitants of*

*the Town of Garland*, 551 F.Supp. 1371, 1376 (D.Me.1982), *aff'd*, 715 F.2d 1 (1st Cir.1983). *Cf. Landrigan v. City of Warwick*, 628 F.2d 736, 741 (1st Cir.1980) [permitting subsequent § 1983 action based on "distinct wrongs resting on different factual bases"].

There can be no question that the underlying transactions in the federal and state court actions are identical. The same legislative enactment is at the heart of both actions. The various state and federal constitutional claims asserted before the state court and the identical federal constitutional issues raised in the present action are simply alternative legal theories supporting the same claim. Nor have the federal plaintiffs presented any new or different facts which would distinguish the present action from the state court action. Both actions have as their common object relief from the alleged harm flowing from implementation of the Act. *See Kradoska v. Kipp*, 397 A.2d at 569. *Cf. Capraro v. Tilcon Gammino, Inc.*, 751 F.2d 56 (1st Cir.1985) [failure of company to employ truck drivers was at the heart of both federal and state court complaints].

Moreover, the record fully warrants the conclusion that the state court plaintiffs were provided a "full and fair opportunity to litigate" their federal constitutional claims in state court. *Kremer v. Chemical Construction Corp.*, 456 U.S. at 481, 102 S.Ct. at 1897 ["state proceedings need do no more than satisfy the minimal procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law"]. *See Lee v. City of Peoria*, 685 F.2d 196, 201 (7th Cir.1982) [procedures and avenues of review afforded plaintiff a full and fair opportunity to litigate his claims].

The state court plaintiffs tendered all of their state and federal constitutional claims to the superior court. There was

court for rehearing of all unresolved issues in the event the Law Court reversed the superior court's declaration of unconstitutionality. That

the Law Court declined to remand buttresses the conclusion that it found no merit in *any* of plaintiffs' constitutional claims.

nothing to prevent the plaintiffs from more actively pursuing their federal constitutional claims before the Law Court. In fact the plaintiffs fully briefed and argued their "void for vagueness" claim before the Law Court, in addition to asserting the supremacy clause issue as an alternative ground for upholding the superior court's declaration of unconstitutionality. That they chose not to press their other federal constitutional claims more vigorously before the Law Court is immaterial. For purposes of *res judicata* it is enough that they could have raised them.

## II. *Preemption*

It is undisputed that Maine's Boston market producers, by virtue of the Act, will realize a return for their milk greater than that received by non-Maine Boston market producers who are subject only to the pricing scheme established by the Federal Order. Plaintiffs contend that the higher price received by Maine's Boston market producers under the Act would violate the uniform pricing authorization contained in section 608c(5)(B)(ii) of the Agricultural Marketing Agreement Act of 1937 [AMAA], as amended, 7 U.S.C. §§ 601 *et seq.*, as implemented by 7 C.F.R. § 1001.61. Plaintiffs therefore argue that the Act is preempted to the extent that its redistribution scheme is inconsistent with the "uniform" pricing imposed by the Federal Order. Plaintiffs further assert that the Act will encourage increased production of milk by Maine's Boston market producers and thereby frustrate the central purpose of the Dairy Production Stabilization Act of 1983.

The United States Supreme Court recently summarized the standards applicable in the field of federal preemption:

Federal law may preempt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. *E.g., Shaw v. Delta Air Lines,* 463 U.S. 85, ——, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). Second, even in the absence of express preemptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. *E.g., Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See also *Fidelity Federal Savings & Loan Ass'n, supra,* 458 U.S. at 153, 102 S.Ct. at 3022.

*Michigan Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Board,* —— U.S. ——, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).

### A. *The AMAA*

 Whether the Act conflicts with the uniform pricing scheme of the AMAA and the Federal Order depends first on whether compliance with both state and federal law would be impossible.[10] *Florida Lime &*

10. Plaintiffs do not contend that the AMAA *expressly* prohibits states from establishing minimum producer prices above those established under the Order. Nor do they assert that under the federal statutory scheme Congress has clearly manifested an intent to preempt or occupy the entire field of milk pricing. *E.g., Schwegmann Brothers Giant Supermarkets v. Louisiana Milk Commission,* 365 F.Supp. 1144, 1157 (M.D. La.1973), *aff'd,* 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974); *United Dairy Farmers Cooperative Ass'n v. Milk Control Commission of Pennsylvania,* 335 F.Supp. 1008, 1014–15 (M.D. Pa.), *aff'd,* 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971). *Cf. Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146–50, 83 S.Ct.

*Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). A comparative analysis of the applicable federal pricing provisions and the Act's provision for higher minimum prices for Maine's Boston market producers fails to reveal any inconsistency or conflict.

In order to promote orderly marketing conditions and to provide stable prices for milk and dairy products, *see* 7 U.S.C. § 602; *see also United States v. Rock Royal Cooperative,* 307 U.S. 533, 543–46, 59 S.Ct. 993, 1000, 83 L.Ed. 1446 (1939); *Bailey Farm Dairy Co. v. Anderson,* 157 F.2d 87, 90 (8th Cir.), *cert. denied,* 329 U.S. 788, 67 S.Ct. 355, 91 L.Ed. 675 (1946), section 608c(1) of the AMAA authorizes the Secretary of Agriculture to issue orders regulating the handling of certain commodities, including milk. Section 608c(5) enumerates

the types of provisions that a federal milk market order may include and has as its principal purpose the establishment of uniform producer prices for all sales subject to the market order.[11] *Zuber v. Allen,* 396 U.S. 168, 179, 90 S.Ct. 314, 320, 24 L.Ed.2d 345 (1969).

Section 608c(5)(A) authorizes the Secretary of Agriculture to classify milk according to its use and to fix the *minimum* price for each such classification. *See* 7 C.F.R. §§ 1001.47, 1001.50. The minimum price set by the Order is not the amount the producer actually receives, but merely determines the "use value" to each handler [12] and the amount each handler either pays into or collects from the producer settlement fund. *See United States v. Rock Royal Cooperative,* 307 U.S. at 554–55, 59 S.Ct. at 1004–05; *Jones v. Bergland,* 456 F.Supp. 635, 638 (E.D.Pa.1978). *See*

---

1210, 1219–21, 10 L.Ed.2d 248 (1963) [nothing in AMAA's establishment of minimum standards reveals congressional design to displace state regulation setting more stringent state standard for importing avocados than set by federal marketing regulations].

**11.** Section 608c(5)(A) & (B) reads:

*Milk and its products; terms and conditions or orders.* In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) (sic) no others:

(A) classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

(B) Providing:

(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: Provided, That, except in the case of orders covering milk products only, such provision is approved or fa-

vored by at least three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period; the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by this section; or

(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered; subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, (d) a further adjustment to encourage seasonal adjustments in the production of milk through equitable apportionment of the total value of the milk purchased by any handler, or by all handlers, among producers on the basis of their marketings of milk during a representative period of time, which need not be limited to one year, and (e) a provision providing for the accumulation and disbursement of a fund to encourage seasonal adjustments in the production of milk may be included in an order.

7 U.S.C. § 608c(5)(A) & (B).

**12.** "Handler" is defined in 7 C.F.R. § 1001.9.

*also Green Valley Creamery, Inc. v. United States,* 108 F.2d 342, 343–44 (1st Cir. 1939), *disapproved on other grounds, Zuber v. Allen, supra.*

■ Section 608c(5)(A) does not even purport to set a *ceiling* on the price a handler may pay a producer. Nor does the AMAA *authorize* the setting of *maximum* prices. Clearly, producers are free to bargain with handlers for prices *higher* than the Federal Order minimum. *Stark v. Wickard,* 321 U.S. 288, 291, 64 S.Ct. 559, 562, 88 L.Ed. 733 (1944); *Schepps Dairy, Inc. v. Bergland,* 628 F.2d 11, 15 (D.C.Cir. 1979).

Because serious inequities could result if the prices individual producers received depended solely on the use to which milk is put, *see Stark v. Wickard,* 321 U.S. at 295, 64 S.Ct. at 563, section 608c(5)(B) permits the Secretary of Agriculture to establish individual handler pools, § 608c(5)(B)(i), or marketwide pools, § 608c(5)(B)(ii), *see Zuber v. Allen,* 396 U.S. at 177 n. 10, 90 S.Ct. at 320 n. 10, as an equalization device under which the individual producer is paid a uniform composite price, not less than the minimum imposed by the Federal Order pursuant to section 608c(5)(A), *see* 7 U.S.C. § 608c(5)(C), for the milk he sells to the handler. Under the Federal Order the uniform blend price is based on the weighted average of the minimum prices established by the Order, less certain deductions and adjustments, for each class of milk. *See Stark v. Wickard,* 321 U.S. at 295 n. 9, 300 & n. 11, 64 S.Ct. at 563 n. 9, 566 & n. 11. *See also Green Valley Creamery, Inc., v. United States,* 108 F.2d at 343. Thus, while handlers are required to pay into the producer settlement fund established by the Order, *see* 7 C.F.R. § 1001.70, varying

amounts determined on the basis of the use to which the milk is put, every *producer* receives "a uniform minimum price for the milk he sells regardless of its use," *Blair v. Freeman,* 370 F.2d 229, 233 (D.C.Cir. 1966).

The Act's pooling arrangement, which results in Maine's Boston market producers receiving prices for their milk above the uniform prices established by the Federal Order, is not inconsistent or in conflict with the federal regulatory scheme. Under the Act, both Maine market producers and Maine's Boston market producers initially receive the same Boston market blend price. The Act creates a further and different source of payment for Maine's Boston market producers; in effect a subsidy to Maine's Boston market producers funded at the expense of Maine market producers and consumers. The Act merely reallocates among both Maine market producers and Maine's Boston market producers the premium price available on the Maine market under the pricing scheme of the Milk Commission. On the present record there is no evidence that the redistributive function served by the Act will in any way impact the uniform *minimum* pricing scheme established for the Boston milk market by the Federal Order. Absent such evidence, the court finds that there is nothing to prevent compliance with both the federal and state programs. Nor is there any basis for finding that the Act is inconsistent with the federal regulatory scheme, either as written or as applied.[13] *See United Dairy Farmers Cooperative Ass'n v. Milk Commission of Pennsylvania,* 335 F.Supp. at 1013; *Medo-Bel Creamery, Inc. v. State of Oregon,* 65 Or.App. 614, 673 P.2d 537, 544 (1983). *Cf. Florida Lime &*

---

**13.** Plaintiffs cite one case in support of their preemption claim. In *Pearce v. Freeman,* 238 F.Supp. 947 (E.D.La.1965), the court struck down as violative of the commerce clause a state regulatory scheme requiring dealers to pay producers according to the dealers' individual utilization rates, whereas the federal market order covering part of the state required that producers be paid according to the order-wide utilization rate. The sole issue before the court in *Pearce* was whether the Secretary of Agriculture

could establish a marketwide pool which was inconsistent with and not solely complementary to the state regulatory scheme under 7 U.S.C. § 610(i). 238 F.Supp. at 949. The court observed in passing that, to the extent that the state scheme established minimum producer prices greater than those established under the Federal Order, there was no conflict because "both were minimum rather than maximum prices," 238 F.Supp. at 950.

*Avocado Growers, Inc. v. Paul,* 373 U.S. at 143, 83 S.Ct. at 1217.

■ Similarly, plaintiffs have failed to show that the Act erects any obstacle to the accomplishment of the *objectives* of the AMAA. The federal regulatory scheme was designed to benefit producers by preventing destructive competition and by maintaining orderly marketing conditions. The Act reflects these same purposes. *See* 7 M.R.S.A. § 3151. Both the federal and state regulatory schemes have as one of their principal objectives the promotion of greater price equality among all producers in the fluid milk market. The pool established under the Act serves the same redistributive function as the producer settlement fund established under the Federal Order. And, as with the Federal Order, the Act provides first for uniform prices to all producers. The Maine milk pool serves the broad purpose of attempting to ensure the vitality of the entire Maine dairy industry. The court is satisfied that the means chosen by Maine to effectuate its legitimate state interest in safeguarding its dairy industry do not frustrate the purposes underlying the AMAA.

### B. *The DPSA*

■ Plaintiffs' second preemption claim is that by encouraging increased production of milk the Act will frustrate the congressional purposes underlying the Dairy Production Stabilization Act of 1983 [DPSA]. Enacted as part of the Dairy and Tobacco Adjustment Act of 1983, P.L. 98–180, 97 Stat. 1128–1143 (November 29, 1983), codified as and amending 7 U.S.C. § 1446(d), the DPSA primarily was designed to curb overproduction of milk and to reduce the high cost of federal government dairy price supports. *See, e.g., South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 877–78 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984) [construing former section 1446(d)(2) ]. *See also* S.Rep. No. 98–163, 98th Cong., 1st Sess., *reprinted in* 1983 U.S.Code Cong. & Ad.News 1658, 1673–75. Because the essence of plaintiffs' challenge is that the Act will encourage overproduction of milk [14] and since plaintiffs have presented no evidence to support that contention, preliminary injunctive relief would be inappropriate. *Cf. McDonough v. Trustees of the University of New Hampshire,* 704 F.2d 780, 784–85 (1st Cir.1983) [upholding denial of preliminary injunctive relief where claim involved intensely fact-specific dispute and record had not been fully developed].

■ In summary, the court finds that plaintiffs have fallen far short of demonstrating a likelihood of success on the merits on their preemption claim. Although the criteria for determining the appropriateness of preliminary injunctive relief ordinarily are to be weighed *inter sese, see Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d 953, 958 (1st

---

**14.** Plaintiffs do not assert that Congress either expressly or impliedly preempted state regulatory milk pricing schemes by its enactment of the DPSA. Plaintiffs do conclusorily assert that the Act will result in higher prices being paid to Maine's Boston market producers and that this result would conflict with the DPSA, which plaintiffs contend in their memorandum "reduces the price paid to farmers in an effort to regulate the production of milk within the United States." Memorandum In Support Of Plaintiffs' Motion For Temporary Restraining Order And Preliminary Injunction, at 6. What plaintiffs apparently intend to convey by this statement is that as a result of their receiving higher milk prices Maine's Boston market producers will be encouraged to produce and deliver more milk to the Boston market. The court has already observed that plaintiffs' mere assertion, without more, cannot provide the basis for granting preliminary injunctive relief. Moreover, the court has serious doubts as to whether the Act has any significant bearing on the purpose of the regulatory scheme established pursuant to the DPSA. It is clear that the primary objective of the DPSA is to limit the exposure of the *federal government* to the high cost of maintaining the federal dairy price support program. *See* S.Rep. No. 98–163, 98th Cong., 1st Sess., *reprinted in* 1983 U.S.Code Congressional & Ad. News 1658, 1670–76. The court has not been apprised of nor can it discern any congressional intent to prevent a state from enhancing the minimum milk prices received by Federal Order milk market producers, so long as the costs of any such program are not borne by the federal government.

Cir.1983), where plaintiffs have failed to show a likelihood of success, the court need go no further, *e.g., Spath v. National Collegiate Athletic Association,* 728 F.2d 25, 27 (1st Cir.1984).[15]

Accordingly, plaintiff's motion for a preliminary injunction is DENIED.

SO ORDERED.

---

**15.** There is no question that Maine has a substantial interest in a well regulated and stable dairy industry, *e.g., Nebbia v. State of New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), and an equally important interest in the prompt implementation of state laws designed to promote that state interest. The Act was enacted in response to a legislatively-perceived need to correct disparities in dairy product pricing which posed a threat to the continued vitality of the Maine dairy industry. *See* 7 M.R.S.A. § 3151. Further delay in the implementation of the Act due to litigation would harm these defendants and the public interest far more than plaintiffs would be harmed by denial of preliminary injunctive relief. Moreover, the apparent delays in plaintiffs' efforts to seek a judicial forum for the resolution of their claims, *see* Memorandum of Intervenors In Opposition To Plaintiffs' Motion For Temporary Restraining Order at 7–9, militates strongly against preliminary injunctive relief.

The court is mindful that plaintiffs will receive less for their milk under the Act than they did prior to its enactment. *See, e.g.,* Affidavits of Ronald Price and Leroy Crane. However, there are approximately 625 Maine producers selling their milk on the Boston market who will suffer considerable financial losses should implementation of the Act be enjoined. *See* Affidavit of Richard Phillips. Balancing the anticipated injury to these plaintiffs against the injury to all of Maine's Boston market producers and considering the important public interest at stake, plaintiffs' delay in pursuing judicial relief and the failure of plaintiffs to demonstrate a likelihood of success on the merits, the scales are decidedly tipped in favor of the defendants and against the granting of injunctive relief.