## MAINE MILK PRODUCERS, INC. et al.

### v.

## COMMISSIONER OF AGRICULTURE, FOOD AND RURAL RESOURCES.

Supreme Judicial Court of Maine.

Argued Sept. 19, 1984.

Decided Oct. 31, 1984.

As Amended on Denial of Motion for Reconsideration Dec. 5, 1984.

---

Linda Smith Dyer (orally), Augusta, for plaintiffs.

H. Cabanne Howard (orally), Jeffrey Frankel, Asst. Attys. Gen., Augusta, Drummond, Woodsum, Plimpton & MacMahon, P.A., Richard A. Spencer (orally), Kathleen Barry, Portland, for appellee.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Maine Milk Producers, Inc., a membership corporation of dairy farmers who sell their milk to Maine dealers, and Harold Brown, one of its members, filed suit on May 17, 1984, in the Superior Court (Kennebec County) challenging the validity of P.L.1983, ch. 573, "AN ACT Creating a Maine Milk Pool" (the "Milk Pool Act"), on the grounds that it is a tax measure that is unconstitutional under art. I, § 6–A, and art. IX, § 8 of the Maine Constitution, and also contravenes various other state and federal constitutional provisions. After a consolidated hearing on plaintiffs' motions for preliminary and permanent relief, the Superior Court in an opinion dated June 27, 1984, declared the core provisions of the Milk Pool Act, 7 M.R.S.A. §§ 3153 and 3154 (Supp. 1983–1984), unconstitutional under art. I, § 6–A (equal protection clause) and art. IX, § 8 (equal tax clause) of the Maine Constitution.[1] The basis for the decision was a finding that the Milk Pool Act assesses taxes unequally and provides no rational basis for distinguishing between those taxed and those not subject to tax. The court did not rule on plaintiffs' other asserted grounds of unconstitutionality. In a supplemental order dated June 29, 1984, the Superior Court also set aside the provisions in the Milk Pool Act repealing certain taxes, which were to have been replaced by provisions of the Milk Pool Act declared to be invalid. From those orders a joint appeal to this court has been taken by the named defendants in the Superior Court action, the Commissioner of Agriculture, Food and Rural Resources and the Maine Milk Commission, and by the intervenors below, being dairy farmers selling on the Boston market and two of their membership corporations. We reverse.

I.

Maine dairy farmers (identified in the Act as "producers") sell their milk to dealers in two different regulated markets: the Boston market (which includes milk dealers in Connecticut, Rhode Island, and parts of Massachusetts, Vermont, and New Hampshire) and the Maine market. The stated purpose of the Milk Pool Act was to even out price disparities between the two markets. 7 M.R.S.A. § 3151 (Supp. 1983–1984).

The Boston market, and the prices paid to producers selling in that market, are regulated under Federal Milk Order No. 1, 7 C.F.R. 1001, promulgated under the Agriculture Marketing Act of 1937, as amended, 7 U.S.C.A. §§ 601–673 (1980 & Supp. 1984). Under the federal order, dealers must keep records of how much milk they

---

1. The relevant provisions of the Maine Constitution read as follows:

Art. I, § 6–A:
No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof.

Art. IX, § 8:
All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof. The Legislature shall have power to levy a tax upon intangible personal property at such rate as it deems wise and equitable without regard to the rate applied to other classes of property.

process as Class I milk (drinking milk) and how much they process as Class II (milk used for other purposes, such as the making of ice cream, butter, cheese, and dried milk). Class I and Class II milk are identical at the time when the dairy farmer sells them to the dealer. However, because the demand for drinking milk is inelastic, dealers are able to charge consumers more for drinking milk than for Class II milk, and accordingly, dealers can afford to pay more for Class I milk.

Producers selling in the Boston market are paid a "blend price" for their milk, which price is the weighted average of the Class I and Class II prices for milk processed in the entire Boston market. The blend price varies depending on the market utilization rate, or percentage of milk used as Class I in the entire market. The higher the Class I utilization rate is, the higher the market blend price is. Every producer selling in the Boston market receives the same basic blend price [2] per hundredweight of his milk, regardless of the use to which that particular milk is actually put and regardless of the utilization rate of the particular Boston market dealer to which he sells.

The federal order also establishes a "producer settlement fund," which is used to rectify the imbalance between dealers whose utilization rates differ from the average rates. All dealers pay their producers the market-wide blend price. Then, dealers whose Class I utilization rates are higher than average pay into the fund amounts that they would have paid to their producers if the blend price had been computed at their individual utilization rates.

Conversely, dealers whose Class I utilization rates are lower than average draw from the fund amounts they paid to their producers over what they would have paid if the blend price had been computed at their own utilization rates.[3]

Milk prices on the Maine market are regulated by the Maine Milk Commission under 7 M.R.S.A. §§ 2951–3156 (1979 & Supp. 1983–1984). As a longstanding practice the Maine Milk Commission has set the minimum producer prices for Class I and Class II milk at the same level as Boston city prices set under Federal Milk Order No. 1. What the Maine market producer actually receives is a blend price that depends upon the rate of utilization of Class I and Class II milk. Maine market dealers, however, compute that blend price on a dealer-by-dealer, rather than a marketwide, basis. Producers selling to different Maine market dealers may thus receive different prices per hundredweight for their milk.

Historically, Maine market dealers have had higher Class I utilization rates than their Boston market counterparts. As a result, producers selling on the Maine market get a higher price for their milk than producers selling on the Boston market.[4] This extra amount is sometimes referred to as the "Maine market premium." The Maine market dealers' higher utilization rates come from their practice of buying "short"; they purchase locally only enough milk to satisfy their average needs and buy any additional amounts needed or sell any local surplus on the Boston market. That practice benefits both Maine market producers, who receive higher blend prices as a result, and Maine dealers, who avoid han-

---

**2.** The basic blend price is adjusted according to the location of the Boston market dealer buying the milk; thus, the actual price paid may vary somewhat from dealer to dealer in the Boston market. For purposes of this opinion, however, we treat the "basic" blend price established under 7 C.F.R. § 1001.61 as the applicable price for the entire Boston market, and ignore the location adjustment to that price, which has no relevance here.

**3.** Producer settlement funds were examined closely by the United States Supreme Court and upheld against constitutional attack in *United States v. Rock Royal Co-op., Inc.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

**4.** For example, in 1982 the average Class I utilization rate on the Maine market was 84% as compared with 53% on the Boston market. As a result, the average blend price in the Maine market that year was $15.00 per hundredweight, while in the Boston market it was only $13.62.

dling large amounts of excess local production for which they have little use and on which they sometimes bear a cost. The Maine market premium has been going to fewer and fewer producers in the recent past. As Maine market producers increase production and add to the Maine dealers' milk supply, the dealers drop some producers onto the Boston market.

The legislature found "that, in terms of net income after operating costs, producers on the Maine market receive, on the average, 50% more than their Boston market counterparts of equal size." 7 M.R.S.A. § 3151. It saw an evil that demanded rectification; it declared:

> [T]hat the lower net returns received by producers selling on the Boston market seriously limits their ability to withstand cost fluctuations caused by unpredictable increases in costs of fuel, credit, feed and other input costs or price fluctuations resulting from changing milk price support policies, all of which are largely controlled by national and international policies and other events beyond their control; that this relative vulnerability engenders an instability in the present marketing system resulting in a destructive competition for higher priced markets; that this instability has recently been aggravated by the introduction of store-brand milk in Maine markets; that the result is a serious threat not only to the viability of these Boston market farms but also to the Maine dairy industry as a whole; and that the loss of these dairy farms would seriously erode Maine's agricultural base.
>
> ... Whereas, this favorable utilization rate [on the Maine market] is made possible by the presence of 2 independently regulated markets which allow the sale of excess Maine production on the Boston market, with the result that such excess is excluded from the calculation of utilization rates on the Maine market, the Legislature finds that the resulting

price difference is in the nature of an economic benefit which has arbitrarily accrued to Maine market producers over Boston market producers.

> The Legislature finds that it is in the best interest of the Maine dairy industry and the well-being of the State as a whole to adjust prices paid to Maine milk producers to redistribute this benefit among Maine milk producers in both markets. In so doing, it is the intention of the Legislature to eliminate those differences attributable to the higher utilization rates which are a product of the 2 regulated markets.

*Id.* In reaction to that perceived need for equalizing the milk prices received by all Maine dairy farmers, regardless of the market in which they sell, and to eliminate the effect of different utilization rates on the price of milk, the legislature created a common fund, administered by the State and known as the Maine Milk Pool.

Under the Milk Pool Act, each Maine market dealer must compute its blend price twice, 7 M.R.S.A. § 3153(2)(A): the first computation is based on its individual utilization rate, while the second is based on the combined utilization rates of all the Boston market dealers. The producers selling to these Maine market dealers are immediately paid the Boston market blend price. The dealers then pay the difference between their individual blend prices and the Boston market blend price into the Maine Milk Pool. At this point in the process, the Maine market producers and the Boston market producers have received the same price for their milk, namely, the Boston market blend price, while the Maine market premium has been paid into the pool. Then, the pool is equally allocated among Maine market and Boston market producers on a per hundredweight basis. Thus, the pool serves a redistributive function to the end of achieving substantial price equality for all Maine-produced milk. On its taking full effect,[5] the Milk Pool Act

5. By P.L.1983, ch. 573, § 20, the dealers' payments to the milk pool, and therefore the

amounts redistributed to producers, are reduced

will establish a new system through which the State will fix the same minimum price for milk sold by any Maine producer[6] on either market.

The milk pool is also used as a source of funds to support State efforts to promote the dairy industry and nutrition programs. The Milk Pool Act repealed the Maine Milk Tax, 36 M.R.S.A. § 4505 (1978 & Supp. 1983–1984), and the Maine Dairy and Nutrition Council Tax, 36 M.R.S.A. § 4524 (1978). P.L.1983, ch. 573, §§ 7, 14. For those prior taxes, the Milk Pool Act substituted deductions from the milk pool at a given rate per hundredweight of milk produced, purchased, or imported into the state.[7] 7 M.R.S.A. § 3154(2)(B). The amounts so deducted from what is otherwise payable to Maine producers are paid over to the Maine Dairy Promotion Board and the Maine Dairy and Nutrition Council. Administrative costs of operating the milk pool are also borne by the pool prior to distribution to producers. *Id.*, § 3154(2)(A).

## II.

A strong presumption of constitutionality attaches to all statutes, which will be construed, where possible, to preserve their constitutionality. *State v. Crocker*, 435 A.2d 58, 63 (Me.1981); *Brann v. State*, 424 A.2d 699, 703 (Me.1981). Any party attacking the constitutionality of a state statute thus carries a heavy burden of persuasion. In order to prevail here, plaintiffs must prove that no logical construction can

be given to the words of the Milk Pool Act that will make it constitutional. They fail to make any such showing.

The amounts deducted from the Maine Milk Pool for promotional purposes were correctly characterized by the Superior Court as taxes. *See Boston Milk Producers, Inc. v. Halperin*, 446 A.2d 33, 37–38 (Me.1982). However, those promotion taxes are not assessed unequally. They are paid at a uniform rate set in 7 M.R.S.A. § 3154(2)(B)[8] out of the milk pool, which is equitably owned in proportion to volume of production by all Boston and Maine market producers. In other words, the promotion deduction is taken out of each producer's account in the Milk Pool, at a set rate fixed per hundredweight. The phrase "prior to the redistribution of the pool" in 7 M.R.S.A. § 3154(2) merely indicates that the deductions for promotion taxes are to be made before the proceeds of the pool are paid out to producers.[9] The collection of the tax from funds in the pool equitably owned by the producers rather than directly from producers does not make the provision invalid. Indeed, it is considerably more efficient to collect the promotion tax out of money already held for producers by the State than it would be to distribute pool funds to producers first, and then require that a portion of those distributions be returned to the State in payment of the promotion tax. Since the promotion tax comes out of the individual pool account of each producer, and since the rate of the promotional deduction is the same per hun-

---

by one half for the first year of the milk pool, ending on May 31, 1985.

**6.** For present purposes we need only note the special provisions of the Milk Pool Act recognizing higher production costs in Aroostook, Washington, and northern Penobscot Counties. *See* 7 M.R.S.A. § 3152(8).

**7.** Producer-dealers and importers for whom no payments to the pool would otherwise be made are required to contribute funds for promotion based on the amount of milk they produce or import. 7 M.R.S.A. § 3153(3).

**8.** The rate of promotion tax is for the first year of pool operations 0.6%, and thereafter 0.8%, of

the preceding year's average Class I milk price, charged against each hundredweight of milk produced, purchased, or imported for sale in Maine. The rate thus requires the same contribution per hundredweight of milk from each producer.

**9.** The legislature's intent is clearly stated in 7 M.R.S.A. § 3151, which as here pertinent reads:

It is also the interest [sic] of the Legislature that deductions from the Maine Milk Pool for promotion be deemed to be deductions from the amounts otherwise payable from the pool to Maine and Boston market producers.

dredweight of milk produced by each producer, the promotion tax is equally assessed.

■■■ The funds taken out of the pool for the purpose of covering expenses of administration do not constitute a tax. The test for whether an assessment is a tax rather than a license fee is whether it is primarily intended to raise revenue rather than to cover costs of administering a program under the police power of government. *Board of Overseers of the Bar v. Lee*, 422 A.2d 998, 1004 (Me.1980). Under that test, the deductions provided for in 7 M.R.S.A. § 3154(2)(A) to cover the costs of administration of the pool are clearly license fees rather than taxes. Hence, they are not subject to constitutional limitations on the state's power to tax. Even if they were treated as a tax, the administrative cost levies would not be invalid for being assessed unequally, since they are in fact evenly imposed in the same way as the promotion tax.

■■■ The payments made into the pool by Maine market dealers for redistribution to producers are not assessments at all. They are simply the mechanism adopted by the legislature for effecting equalization of the price received by all Maine dairy farmers for their milk. The intent of the legislature to change the minimum price for milk received by Maine producers is demonstrated by section 2 of the Milk Pool Act, which added subsection 9 to 7 M.R.S.A. § 2954, the basic statutory source of the Maine Milk Commission's power to establish minimum wholesale and retail prices for milk in Maine. That new subsection 9 reads: **"Minimum wholesale prices to producers.** Notwithstanding any other provisions of this chapter, minimum wholesale prices to producers shall be subject to the provisions of chapter 611 [the Milk Pool Act]." There is no tax involved in the statutory pooling system for establishing more nearly uniform prices for all Maine produced milk.[10]

The crux of plaintiffs' argument is that since different Maine market dealers will pay different amounts into the pool, depending on their individual utilization rates, producers selling milk to different Maine market dealers will also "lose" varying amounts under the Milk Pool Act, depending on their dealers' utilization rates. However, the pooling arrangement suffers from no constitutional infirmity. It is true that the Milk Pool Act will have the effect of cutting the price *formerly* received by some milk producers and raising the price *formerly* received by others. Since originally some producers were receiving a higher price than others, and since they will all receive the same price under the Milk Pool Act, that is hardly a surprising result. It is simply a natural consequence of any price-equalizing scheme that those who made the most previously will "lose" more than anyone else. The legislature has undoubted power to regulate the price of milk. *Maine Milk Commission v. Cumberland Farms Northern, Inc.*, 160 Me. 366, 205 A.2d 146 (Me.1964), *appeal dismissed*, 380 U.S. 521, 85 S.Ct. 1333, 14 L.Ed.2d 266 (1965). Its doing so in this

10. In connection with the redistributive function of the milk pool, the legislative intent is made clear by 7 M.R.S.A. § 3151, as follows:
    It is the intent of the Legislature that the reblending of Class I premiums under the Maine Milk Pool created by this chapter be deemed to be the reapportionment of an economic benefit created by regulation in order to smooth out differences in milk prices between different markets and not as a tax on the income of Maine market producers.
    Earlier in section 3151, the legislature had made the following finding in regard to the regulatory source of the economic benefit which the milk pool is designed to redistribute:
    Whereas this favorable utilization rate [on the Maine market] is made possible by the presence of 2 independently regulated markets which allow the sale of excess Maine production on the Boston market, with the result that such excess is excluded from the calculation of utilization rates on the Maine market, the Legislature finds that the resulting price difference is in the nature of an economic benefit which has arbitrarily accrued to Maine market producers over Boston market producers.

case cannot be thought unfairly to burden any Maine market producer, since the price received by producers for their milk will, under the Milk Pool Act, only be closer to a uniform rate for every producer in Maine.

In sum, the payments into the Maine Milk Pool to carry out its redistributive function are not a tax, but rather merely constitute the mechanism for carrying out the legislature's price-fixing power over milk produced in Maine. On the other hand, the deductions made from the milk pool for promotion do constitute taxes, but those taxes do not suffer from any constitutional infirmity because they are assessed upon all producers at a fixed amount per hundredweight of milk produced.

### III.

On appeal, plaintiffs have fully briefed two alternative grounds for upholding the decision of the Superior Court invalidating the Milk Pool Act. They contend, first, that the Milk Pool Act involves an unconstitutional delegation or surrender of the legislative taxing power [11] and second, that it is void for vagueness. We reject both of those alternative constitutional contentions.

■ Since the promotion deduction is the only tax imposed by the Milk Pool Act, it is the only provision of the Act subject to the constitutional prohibition against delegation or surrender of the legislature's taxing power. 7 M.R.S.A. § 3154(2)(B) sets the rate of the promotion tax as a given percentage of the price of Class I milk per hundredweight. *See* n. 7 above. Thus, the promotion tax rate varies depending on the price of Class I milk, which price is fixed by the Maine Milk Commission under 7 M.R.S.A. § 2954. That section lists considerations for the Commission to take into account in discharging its price-setting responsibilities. 7 M.R.S.A. § 2954(2). That list is detailed and provides a constitution-

ally adequate guide to the Commission in setting milk prices. *See Maine Milk Commission v. Cumberland Farms Northern, Inc.*, 160 Me. at 380–81, 205 A.2d at 153. The Class I prices have obvious significance, indeed their principal significance, that is outside their impact on the promotion tax. *Cf. Lucas v. Maine Commission of Pharmacy*, 472 A.2d 904, 909–11 (Me. 1984) (independent significance of pharmacy college accreditation). The Class I price for milk is thus set on legislatively sufficient criteria for a significant independent purpose. The promotion tax is identical in operation to a legislatively set percentage sales tax upon goods whose price is set by the seller or other agency for independent reasons. There is here no unconstitutional delegation of the power to tax.

To support their contention that the Milk Pool Act is void for vagueness, plaintiffs have searched out a few alleged ambiguities in the statute. Those examples are insufficient to invalidate the Milk Pool Act as unconstitutionally vague.

■ An attack on a statute for facial unconstitutionality due to vagueness will not be supported merely because some hypothetical situations may require future judicial interpretation of the statutory language. *Shapiro Brothers Shoe Co., Inc. v. Lewiston-Auburn Shoeworkers Protective Association*, 320 A.2d 247, 253–254 (Me.1974). A statute is void for vagueness only when "it sets guidelines which would force men of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forcing courts to be uncertain in their interpretation of the law." *Id.*, at 253.

■ We have reviewed with care each of the instances of vagueness claimed by plaintiffs to make the Milk Pool Act unconstitutional. We find none of constitutional

---

**11.** Article IX, section 9 of the Maine Constitution states that "[t]he legislature shall never, in any manner, suspend or surrender the power of taxation." That language creates a "strong and

sweeping prohibition" against delegation of the legislature's power to tax. *Boston Milk Producers, Inc. v. Halperin*, 446 A.2d at 40.

dimension. Most can be resolved by close reading of the statutory language without more. The rest require merely application of accepted interpretative processes to the disputed language in light of the overall regulatory scheme created by the Act and its extensive legislative findings and statement of purpose. However desirable it would be for the legislature always to speak in precise and pellucid language, failure to meet that Olympian standard does not make its enactments void for vagueness. Plaintiffs fail to persuade us that the Milk Pool Act is on its face so resistant to normal processes of statutory construction as to be unconstitutional. An item-by-item analysis of plaintiffs' statutory construction arguments would serve no purpose.

### IV.

In conclusion, we hold that the Superior Court misconceived the nature of the Maine Milk Pool and as a result erred in declaring that the Act creating it violated the equal tax and equal protection clauses of the Maine Constitution. When properly understood as a regulatory device for setting the prices received by Maine dairy farmers for their milk, the milk pool is seen not to involve a tax. Although the deductions made against the producers' shares in the pool do constitute taxes imposed to pay for the State's promotional efforts, the burden of those promotion taxes falls on all producers evenly on the basis of the volume of their production. There is nothing unconstitutional in requiring the milk pool to bear its own administrative costs.

We also find no merit in any of the alternative arguments presented by plaintiffs for affirming the Superior Court's declaration of unconstitutionality.[12]

The entry is:

Paragraph 1 of the order of the Superior Court dated June 27, 1984, is reversed, as is paragraph 4 of its supplemental order dated June 29, 1984.

Paragraph 2 of said June 27, 1984, order is vacated.

All concurring.

---

**12.** A companion case to the present suit, Docket No. CV84–186 (Superior Court, Kennebec County), challenging the rules implementing the Milk Pool Act, was dismissed as moot by the same June 27, 1984, order that declared the Milk Pool Act unconstitutional. That dismissal was not appealed. We do not decide whether our decision in this case might warrant the Superior Court's vacating the dismissal of the companion case on a motion under M.R.Civ.P. 60(b).