GRANT'S DAIRY, INC., Plaintiff,

v.

Ed McLAUGHLIN, et al., Defendants.

No. Civ. 98–98–B.

United States District Court,
D. Maine.

Aug. 31, 1998.

Neal K. Stillman, Portland, ME, John H. Vetne, Newburyport, MA, for Plaintiff.

Lucinda E. White, Assistant Attorney General, Augusta, ME, for Defendants.

Linda Smith Dyer, Dyer & Goodall, Augusta, ME, for Intervenor Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, Grant's Dairy, Inc., brings this case against Defendants, Ed McLaughlin, Commissioner of Agriculture, Food & Rural Resources for the State of Maine, the Maine Milk Commission (the "Commission"), Cynthia Masterman, the Commission's Executive Director, Colon Durrell, Chairman of the Commission, and several other members of the Commission, challenging the Commission's authority to impose the minimum prices it sets under the Maine Milk Commission Act, 7 M.R.S.A. § 2951 *et seq.*, upon a dealer fully regulated under the New England Milk Marketing Order. Plaintiff alleges that Defendants' regulatory conduct is not authorized by the Maine Milk Commission Act (Count I), and that Defendants are estopped under a Maine Superior Court decision from imposing their state regulations on Plaintiff (Count II). Plaintiff also alleges that Defendants' conduct violates the Supremacy Clause, Commerce Clause, and Equal Protection Clause of the United States Constitution, the Equal Protection Clause of the Maine Constitution, and 42 U.S.C. § 1983 (Counts III–VII). Maine Milk Producers, Inc. ("MMP"), a Maine not-for-profit corporation comprised of Maine dairy farmers who sell their milk to milk processors located in Maine, has intervened on behalf of Defendants. Before the Court is Defendants' motion to certify the following question to the Supreme Judicial Court of Maine:

Does 7 M.R.S.A. § 2954 authorize the Maine Milk Commission ("Commission") to require a federally regulated milk processor ("dairy" or "dealer") with a processing plant located in Maine, purchasing and processing (at its Maine plant) milk from Maine producers, or processing milk delivered to its Maine plant from Maine producers, which milk is then sold in Maine, to pay such Maine producers (for that milk which is sold in Maine) the minimum price set by the Commission?

In the alternative, Defendants request that the Court abstain from deciding Plaintiff's state law claims and require Plaintiff to pursue these claims in state court. For the reasons set forth below, the Court denies Defendant's Motion for Certification or, in the alternative, for Abstention.

## I. REGULATORY FRAMEWORK

Entities such as Plaintiff, who purchase raw milk and process it, are called "handlers" or "dealers" in regulatory terminology. Dairy farmers who sell to dealers are known as "producers." Because Maine dairy farmers produce more milk than can be consumed in Maine alone, Maine producers sell their milk to dealers who distribute in two separately regulated markets, the Boston or "Federal" market, and the Maine market. The Federal New England Milk Marketing Area (the "Federal marketing area") includes all or portions of Massachusetts, Rhode Island, Connecticut, Vermont, and New Hampshire, but no part of Maine. 7 C.F.R. § 1001.2. Under Maine regulatory parlance, Maine dairy farmers who sell to dealers marketing milk on the Maine market are known as Maine market producers. Maine dairy farmers who sell to dealers marketing milk on the Federal market are known as Federal market producers. *See* 7 M.R.S.A. § 3152.

The Federal market is regulated pursuant to the New England Milk Marketing Order (the "Federal Order"), 7 C.F.R. § 1001 *et seq.*, promulgated under the Agricultural Marketing Agreement Act, 7 U.S.C. §§ 601 *et seq.* Under the Federal Order, payment obligations are fixed based on the ultimate use of the milk. The highest price, known as the Class I price, applies to drinking milk. A

lower Class II price applies to milk used in soft manufactured products such as cottage cheese, ice cream, and yogurt, and a Class III price applies to milk used in goods such as butter, hard cheese, and powder. 7 C.F.R. §§ 1001.40–.55.

All producers who sell in the Federal market receive a "blend price" for their milk, which is based upon the average use of milk in all classes of utilization by all regulated dealers in the Federal market. 7 C.F.R. §§ 1001.60, 1001.73. The higher the Class I utilization rate, or the percentage of milk used as Class I milk in the Federal market, therefore, the higher the blend price. For economic reasons, the blend price is also adjusted according to the location of the Federal market dealer. *See* 7 U.S.C. § 608c(5)(B).

In order to ensure that all Federal market producers receive the same minimum price for their milk, regardless of the ultimate use of that milk, the Federal order provides for a "producer settlement fund" (the "Federal Pool"). As discussed above, all dealers pay their producers the market-wide established blend price. Dealers with Class I utilization rates above the market-wide average then pay the difference between the blend price and the amount they would have paid if the blend price was computed at their individual utilization rates into the Federal pool. Those dealers with Class I utilization rates below the market-wide average receive payments from the pool so that they can pay their producers the uniform blend price. 7 C.F.R. §§ 1001.70–.74.

A dealer who sells in the Federal market may be either fully or partially regulated under the Federal Order. A dealer becomes fully regulated, meaning that all of its producer-to-dealer transactions during a given month are subject to federal regulation, by meeting certain performance standards. Generally, a distributing plant becomes fully regulated when at least 10% of its fluid milk receipts are distributed in packaged fluid form in the Federal marketing area. 7 C.F.R. § 1001.7a. A partially regulated dealer is subject to federal regulation only on those sales made in the Federal marketing area.

Pursuant to the Maine Milk Commission Act, Maine regulates prices in the Maine milk market under a system similar to the Federal system. The minimum producer prices adopted by the State are essentially the Federal Order Class I, Class II, and Class III prices, plus a State-mandated premium or over-order price. 7 M.R.S.A. § 2954(2).

Prior to 1985, Maine market producers received a blend price based on the utilization rate of the buying dealer, rather than on the market-wide utilization rate used under the Federal Order. Under the state system, therefore, producers received various blend prices depending on the percentage of each dealer's Class I use. For a variety of reasons, Maine market dealers' Class I utilization rates have tended to exceed the utilization rates of Federal market dealers, creating a price differential between the prices paid to Maine market producers and Federal market producers. This price differential is known as the Maine market premium. *See generally, Crane v. Commissioner of Agriculture*, 602 F.Supp. 280, 283–84 (D.Me.1985).

In order to equalize the milk prices paid to all Maine dairy farmers regardless of the market in which they sell their milk, the Maine State Legislature in 1983 enacted the Maine Milk Pool Act, 7 M .R.S.A. § 3151 *et seq.* Under the Milk Pool Act, Maine milk producers are automatically paid a price based on the Federal Order blend price. Maine market dealers then pay the difference between their individual blend prices and the federal price into the Maine Milk Pool. Subject to some adjustments, the funds received by the Pool are redistributed on an equal basis to all Maine market producers and Federal market producers, thereby achieving substantial price equality for all Maine-produced milk. 7 M.R.S.A. § 3153. The Maine Milk Commission conducts regular audits of dealers to verify compliance with the Maine Milk Pool Act and the Maine Milk Commission Act.

Finally, pursuant to § 147 of the 1996 Farm Bill, Pub.L. 104–127, Congress conditionally approved of additional raw milk minimum price regulation through the Northeast

Interstate Dairy Compact Commission, an interstate agency made up of all the New England States, including Maine. *See* 7 U.S.C. § 7256. The Northeast Interstate Dairy Compact authorizes the New England states to fix minimum milk prices at a level higher than those established by federal regulation. Subject to certain adjustments, dealers regulated under the Compact pay the difference between the Compact Commission price and the Federal Order price into a pool.

## II. BACKGROUND

Plaintiff, a dealer, operates a milk processing plant in Bangor, Maine. Plaintiff purchases about 10 million pounds of raw milk per month from Maine dairy farmers, cooperative associations and other sources, most of which ends up as Class I fluid milk. For many years, Plaintiff distributed its fluid milk products exclusively within Maine and was regulated as a Maine market dealer under the Maine Milk Commission Act and the Maine Milk Pool Act. In October, 1997, however, Plaintiff began delivering milk to new accounts in New Hampshire and Massachusetts, causing Plaintiff to become subject to federal regulation under the Federal Order. Since November, 1997, Plaintiff has distributed more than 10% of its milk into the Federal marketing area and has, accordingly, become fully regulated under the Federal Order. Since July 1, 1997, Plaintiff has also been regulated under the Northeast Interstate Dairy Compact.

In October, 1997, Plaintiff advised its producer-patrons that its out-of-state sales would cause Plaintiff to become fully regulated under the Federal Order beginning November 1, 1997. Plaintiff alleges that Defendant McLaughlin attempted to persuade Plaintiff to voluntarily pay the Commission's monthly premium to offset the reduction in Maine Milk Pool revenues resulting from Plaintiff's new status as a fully federally regulated entity. Plaintiff, however, refused. At a regular meeting of the Commission on March 12, 1998, Plaintiff contends that the Commission approved notice of proposed rule amendments which would implement the Commission's position that its minimum milk prices and premiums applied to Federal market dealers on the milk these dealers purchased and distributed in Maine. At this meeting, Plaintiff expressed its position that it was not subject to regulation under the Maine Milk Commission Act because of its status as a fully federally regulated dealer.

On April 10, 1998, Defendant Masterman notified Plaintiff that an audit of Plaintiff's records for the months of December, 1997 and January, 1998, indicated that Plaintiff had failed to pay the minimum prices established by the Commission to Maine producers during these months. Defendant Masterman threatened enforcement action against Plaintiff if Plaintiff did not make up for the shortfall. Plaintiff alleges that it owes no additional sums to its Maine producer patrons for those months, because Plaintiff completely satisfied the requirements established by the Federal Order and the Northeast Interstate Dairy Compact, and additionally paid a certain amount in voluntary premiums to its dairy farmer patrons and its cooperative supplier, Agri–Mark.

## III. DISCUSSION

### A. Certification

▮ The question Defendants wish to certify to the Supreme Judicial Court is, essentially, whether the Commission is authorized to enforce upon a dealer fully regulated under the Federal Order "the State's minimum milk prices to be paid to Maine's dairy farmers for milk produced, processed and sold in Maine."[1] Defs.' Mot. Certify at 2. The decision whether or not to certify a question of state law to the state's highest court rests within the "sound discretion of the federal court." *E.G. Fischer v. Bar Harbor Banking and Trust Co.*, 857 F.2d 4, 6 (1st Cir.1988). In Maine, certification to the Supreme Judicial Court is authorized by 4 M.R.S.A. § 57, which provides, in relevant part:

1. In their formulation of the proposed question for certification and memoranda, Defendants describe Plaintiff as a "federally regulated dealer." The Court assumes that by "federally regulated"

Defendants mean "fully federally regulated," because Defendants do not dispute that Plaintiff became fully subject to federal regulation in November, 1997. *See* Defs.' Mot. Certify at 4 n. 4.

When it shall appear to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there are involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court, such federal court may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court sitting as a law court may, by written opinion, answer.[2]

▇▇ Under 4 M.R.S.A. § 57, the Court may certify a question of state law to the Supreme Judicial Court if it finds that there is no clear, controlling state-law precedent. *See Nuccio v. Nuccio,* 62 F.3d 14, 17 (1st Cir.1995). In addition, certification is only appropriate if there is no dispute as to the material facts, and the Supreme Judicial Court's answer to the proposed state law question will, "in at least one alternative, be determinative of" the federal cause. *Lovell v. One Bancorp,* 614 A.2d 56, 57 (Me.1992); *see also Hiram Ricker & Sons v. Students Intern. Meditation Soc.,* 342 A.2d 262, 264 (Me.1975). Plaintiff asserts that certification of Defendant's proposed question is unnecessary and inappropriate because there is no uncertainty as to how the Supreme Judicial Court would rule. Plaintiff contends that the Law Court would answer Defendant's proposed question in favor of Plaintiff, and hold that so long as Plaintiff is fully subject to federal regulation, Plaintiff is not required to pay Maine producers the minimum price set by the Maine Milk Commission on milk purchased from Maine dairy farmers and distributed to Maine consumers.

▇▇ The Court agrees with Plaintiff's position. Plaintiff acknowledges, as does the Court, that the Supreme Judicial Court has not addressed the precise question presented by Defendants. Nevertheless, in the absence of a determinative ruling from the Supreme Judicial Court, the Court may predict what the state's highest court would do when "the course [the] state court[ ] would take is rea-

sonably clear." *Porter v. Nutter,* 913 F.2d 37, 41 n. 4 (1st Cir.1990); *Bi–Rite Enterprises, Inc. v. Bruce Miner Co.,* 757 F.2d 440, 443 n. 3 (1st Cir.1985) ("it is inappropriate for a federal court to use such a [certification] procedure when the course state courts would take is reasonably clear.") In making such a prediction, "a federal court may consider 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.' " *E.G. Fischer,* 857 F.2d at 7 (quoting *Michelin Tires, etc. v. First Nat'l Bank of Boston,* 666 F.2d 673, 682 (1st Cir.1981)).

▇▇ Based on existing precedent from the Supreme Judicial Court and a Superior Court decision analyzing the relationship between the state and federal systems for regulating minimum milk prices as applied to a fully federally regulated dealer, the Court is satisfied that it is "reasonably clear" that the Law Court would endorse Plaintiff's position. In *Maine Milk Producers, Inc. v. Commissioner of Agriculture,* 483 A.2d 1213 (Me. 1984), the Supreme Judicial Court addressed the constitutionality of the Maine Milk Pool Act. In finding the Act constitutional, the court recognized that Maine dairy farmers sell their milk to dealers in "two different regulated markets: the Boston market … and the Maine market." *Id.* at 1215. The court noted that the Maine legislature passed the Maine Milk Pool Act to "equalize[ ] the milk prices received by all Maine dairy farmers, regardless of the market in which they sell," and that the Pool Act would "establish a new system through which the State will fix the same minimum price for milk sold by any Maine producer on either [the Boston or the Maine] market." *Id.* at 1217–18. While the court did not address the authority of the Maine Milk Commission over a fully federally regulated dealer, the court's opinion indicates that it recognized that the federal and state systems for regulating milk prices operate independently of each other, with the state's milk prices set in accordance with both the Maine Milk Commission Act and the Maine Milk Pool Act. It follows logically from the

---

**2.** The procedures applicable to certification are    set forth in M.R.Civ.P. 76B(b)–(f).

court's opinion that a dealer fully subject to the federal regulatory scheme would not also be subject to Maine's regulatory scheme.

Plaintiff additionally draws the Court's attention to the Maine Superior Court's decision in *Commissioner of Agriculture v. H.P. Hood, Inc.*, CV–90–308 (Sup.Ct. September 11, 1991). In *Hood,* the court addressed the issue of whether the Commission has the authority to collect payments into the Maine Milk Pool from a dealer fully subject to regulation under the Federal Order. The dealer, H.P. Hood, Inc. ("Hood"), had for several years been partially regulated under the Federal Order. *Id.* at 7: In February, 1990, however, Hood received word from the Administrator of the Federal Order that its distributions into the Federal marketing area for certain months had exceeded 10% of the Plant's fluid milk received, causing it to become fully subject to Federal regulation. In other words, during the months specified by the Administrator, "all of the plant's producer-to-dealer transactions became subject to minimum price obligations as specified in the Federal Order, including transactions with producers whose milk was sold for Class I consumption on the Maine Market." *Id.* at 8–9. In response to the Administrator's determination, Hood paid an additional amount into the Federal pool on account of its new regulatory status. A dispute arose, however, between Hood and the Maine Milk Commission over Hood's responsibilities to the Maine Milk Pool for those months in which Hood was fully subject to the Federal Order.[3] *Id.* at 9–11. Hood claimed that because all of its producer-dealer transactions for those months were subject to Federal regulation, it

was not also required to pay into the Maine Milk Pool for the milk it purchased from Maine producers and distributed to Maine consumers. The Commission claimed that Hood was still responsible for Pool payments on these Maine–Maine transactions. *Id.*

In a detailed opinion authored by Justice Alexander,[4] the Superior Court held that Hood was not obligated to make payments into both the Federal Pool and the Maine Milk Pool during those months it was fully federally regulated. *Id.* at 17. The court acknowledged that under the plain language of the Maine Milk Pool Act Hood qualified as both a Maine market dealer and a Federal market dealer during those months.[5] As a result, Hood was potentially subject to both state and federal regulation during that time, unless "the Pool Law [was] interpreted to terminate State pooling regulation when Federal pooling regulation applies." *Id.* at 12. The court further found that the legislative drafters of the Maine Milk Pool Act never contemplated the possibility that a Maine market dealer might also become subject to full federal regulation. *Id.,* at 12–13. Nevertheless, the court rejected the State's argument that requiring Hood to pay double pool payments on its Maine–Maine transactions was consistent with State law and constitutional. Given that "the overall purpose of the pool program was to equalize blend price payments to producers, regardless of whether they sold to a Maine market dealer or a Boston market dealer," *id.* at 13, the court held that considering a dealer to be both a Maine market dealer and a Federal market dealer for the purposes of pool payments was illogical. *Id.* Moreover, interpret-

3. The details of this dispute are fully set forth in the Superior Court's Opinion. Essentially, after failing to receive a refund from the Maine Milk Pool for those months in which Hood was fully subject to Federal regulation, Hood adjusted its sales of milk into the Federal market so as to avoid federal regulation in the future. Hood then made only minimal payments into the Maine Milk Pool, seeking to offset the amount it owed by the amount it claimed the Pool owed it. *Hood,* at 9–11.

4. Justice Alexander has since been confirmed as an associate justice of the Supreme Judicial Court of Maine.

5. Pursuant to § 3152 of the Maine Milk Pool Act, a Boston market dealer is defined as "any dealer ... who purchases milk from producers subject to the price regulations of the New England Milk Marketing Order." 7 M.R.S.A. § 3152(2). A Maine market dealer is similarly defined as "any dealer ... who sells milk subject to the price control authority of the Maine Milk Commission." 7 M.R.S.A. § 3152(5). A Boston market producer is defined as "any Maine milk producer selling to a dealer marketing milk subject to the New England Milk Marketing Order," 7 M.R.S.A. § 3152(3), and a Maine market producer is defined as "any Maine milk producer selling to a dealer marketing milk on the Maine market." 7 M.R.S.A. § 3152(6).

ing the Maine Milk Pool Act in such a way might raise constitutional problems, including potential violations of the Equal Protection Clause, the Commerce Clause, and the Supremacy Clause of the United States Constitution, and the Equal Protection section of the Maine Constitution. *Id.* at 14–16. The Court, therefore, concluded that:

> when a dealer becomes a Boston market dealer and thus subject to the price regulations of the New England Marketing Order, that dealer cannot also be a Maine market dealer subject to the payment obligations of the Maine Milk Pool applicable to Maine market dealers by operation of 7 M.R.S.A. § 3153(2).

The Court finds the Superior Court's reasoning in *Hood* persuasive. Defendants allege that *Hood* is not relevant to the present case, because it involved the applicability of the Maine Milk Pool Act to a fully federally regulated dealer and this case, in contrast, involves the authority of the Commission to require a fully federally regulated dealer to pay the state's minimum milk prices. In other words, even though Defendants concede that Plaintiff is not subject to the requirements of the Maine Milk Pool Act because it sells more than 10% of its processed fluid milk in the Federal marketing area, Defendants assert that Plaintiff must still pay the minimum prices set by the Commission to Maine producers on milk it sells to Maine consumers. In support of their argument, Defendants note that § 2954 of the Maine Milk Commission Act authorizes the Commission to set the minimum milk prices to be paid to producers, dealers, and stores irrespective of a producer's or dealer's status as a Maine market producer/dealer or a Federal market producer/dealer. *See* 7 M.R.S.A. § 2954.

The Court rejects Defendants' argument. The Court acknowledges that 7 M.R.S.A. § 2954 does not, on its face, preclude the Commission from enforcing its price requirements upon a dealer fully subject to regulation under the Federal Order, and considered to be a Federal market dealer under the Maine Milk Pool Act. The Court is persuaded, however, that the Maine Milk Commission Act does not operate independently of the Maine Milk Pool Act. Rather, the Maine Milk Commission Act must be read in conjunction with the Maine Milk Pool Act as creating one integrated system for regulation of the Maine milk market. Indeed, § 2954(9) of the Maine Milk Commission Act provides that "minimum wholesale prices [set by the Commission] to producers shall be subject to the provisions of chapter 611 [the Milk Pool Act]." Once a dealer is fully subject to regulation under the Federal Order, it follows that it is no longer subject to regulation by the state, whether that regulation be in the form of pool payments or minimum price requirements. Just as the *Hood* court found it illogical for a fully federally regulated dealer to pay dual pool taxes on milk it purchases from Maine dairy farmers and sells to Maine consumers, the Court finds it illogical to require a fully federally regulated dealer already subject to federal price requirements on its Maine–Maine transactions to satisfy the Commission's price requirements on these transactions as well. Since Plaintiff has become fully regulated under the Federal Order, it has satisfied the requirements established by both the Federal Order and the Northeast Interstate Dairy Compact Commission on all of its producer-dealer transactions. Because the Court finds that it is "reasonably clear" that the Supreme Judicial Court would find that Plaintiff does not also have to satisfy the state's minimum price requirements on milk it purchases and distributes in Maine, the Court denies Defendants' Motion for Certification.

B. Abstention

Alternatively, Defendants assert that the Court should abstain from deciding Plaintiff's state law claims and require Plaintiff to pursue these claims in state court. Defendants allege that abstention is appropriate in this case because a state court ruling in Plaintiff's favor on the state law issue would avoid the need for any federal determination of the federal constitutional issues. Under one theory of abstention, Pullman-type abstention, "[a] federal court may . . . stay its consideration of a case until a state court decides an issue of state law in the case that will end the controversy without need for a resolution of a federal consti-

tutional question, or that, at least, will make resolution of the federal question somewhat easier." *Bath Memorial Hospital v. Maine Health Care Finance Commission,* 853 F.2d 1007, 1012 (1st Cir .1988) (citing *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941)); *see also,* 17A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 4242, at 30 (2d ed.1988). The Supreme Court has admonished, however, that "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (citations omitted). Because the Court is persuaded that it is reasonably clear that the Supreme Judicial Court would decide the state law issue in favor of Plaintiff, the Court finds that abstention is not appropriate in this case. The Court, accordingly, denies Defendants' Motion for Abstention.

### IV. CONCLUSION

For the reasons set forth above, the Court denies Defendants' Motion for Certification, or in the alternative, for Abstention.

*SO ORDERED.*